IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GIOVANNI REID, | : | CIVIL ACTION |
| Petitioner | : | |
| | : | NO. 2:01-cv-02385 |
| V | : | (prior habeas action) |
| | : | |
| DONALD VAUGHN, et al., | : | |
| Respondents | : | |

## CONTENTS

INTRODUCTION ..................................................... 1

CLAIMS RELATING BACK TO ORIGINAL HABEAS ACTION ................. 3

ADDITIONAL SUPPORTING EVIDENCE OF PETITIONER'S ACTUAL AND
FACTUAL INNOCENCE ............................................. 10

      A. Crime Scene Evidence ........................... 10

      B. Admissions and Adoption of an Exonerating
      Statement by the Opposing Party-Opponent ........ 14

NEW MATTERS ..................................................... 17

      A. Judicial Notice of Adjudicative Facts ........... 17

      B. Motion for Partial Summary Judgment ............. 18

REQUEST TO STAY AND HOLD THIS MOTION IN ABEYANCE ............. 18

CONCLUSION ..................................................... 20

CERTIFICATE OF SERVICE ........................................ 21

EXHIBITS:

A. Motion under 28 U.S.C. § 2244 for Order Authorizing District
Court to Consider Second or Successive Application for Relief
under 28 U.S.C. § 2254 - docketed at 13-3076, June 19, 2013

B. Wayne Richman's Initial E-Mail and Deposition, February 6,
2006 and March 13, 2006

C. Transcripts from State Evidentiary Hearing - pp. 83-84, 103,
113-114, 118-120, November 7, 2012

i

| | | |
|---|---|---|
| GIOVANNI REID, | : | CIVIL ACTION |
| Petitioner | : | |
| | : | NO. 2:01-cv-02385 |
| V | : | (prior habeas action) |
| | : | |
| DONALD VAUGHN, et al., | : | |
| Respondents | : | |

## PETITIONER'S MOTION TO RELATE BACK TO ORIGINAL HABEAS ACTION

TO THE HONORABLE DISTRICT JUDGE STEWART DALZELL:

Petitioner, Giovanni Reid, acting pro se, hereby files this instant motion to relate back to his original habeas action pursuant to F.R.C.P., Rule 15(C)(1)(B), and in support thereof, Petitioner respectfully represents the following:

### Introduction

1. On June 14, 2001, Petitioner filed his initial writ of habeas corpus petition - docketed at the above captioned number. This habeas action raised the following two (2) claims for relief: (1) [t]he state court failed to identify and then apply the governing United States Supreme Court principles of Brady v. Maryland to the claim that the Commonwealth failed to disclose evidence that (a) its central witness, Tyrone Mackey, gave a pre-trial statement to the trial prosecutor completely exonerating petitioner and (b) the prosecutor then threatened Mackey with a perjury prosecution if he did not recant that exonerating statement such that its adjudication denying any relief resulted in a decision that was contrary to, or involved an unreasonable

1

application of, clearly established federal law; and (2) [t]he state court ruling that the prosecution's failure to disclose its $1,500 cash payments to, and provision of luxury hotel accommodations for its two central witnesses was "not material" is an objectionably unreasonable application of federal law because these were the only witnesses to incriminate Petitioner and the cash and hotel benefits they received directly affected their credibility.

2. On July 29, 2002, U.S. Magistrate Judge Diane M. Welsh issued her Report and Recommendation, recommending that Petitioner's Writ of Habeas Corpus be denied.

3. On March 4, 2003, this Court issued a Memorandum, ordering that an evidentiary hearing be held on Petitioner's contention made in Ground one and Ground two of his petition for habeas corpus as it related to witness Tyrone Mackey informing the prosecutor during a trial recess that Petitioner was fifteen feet away from the victim and the prosecutor "threat[s]" to Mackey.[1]

---

[1] In the Memorandum, this Court recognized that "whether the statement of Mackey is indeed favorable to the defense depend[ed] on such details as when, in the sequence of events, Mackey placed [Petitioner] as standing fifteen feet away from the victim." See Memorandum, 3/4/03 - p. 3.

As argued more fully below, the distance in which Petitioner was standing away from the victim is highly relevant to the claims that are raised in this instant motion.

2

4. The hearing date was set for June 4, 2003, however, due to Petitioner's then counsel having an health emergency, the hearing was canceled and rescheduled for July 22, 2003.

5. During the evidentiary hearing Tyrone Mackey testified that "[Petitioner] was not in the vicinity with Dwayne Bennett at the time of the shooting, that he had to be at least 15 to 20 feet away from him." Reid v. Vaughn, 279 F.Supp.2d 636, 670 (E.D.Pa. 2003).[2]

6. Following the evidentiary hearing, on August 28, 2003, this Court issued an order denying habeas relief, but issued a certificate of appealability. See Reid v. Vaughn, id.

7. Petitioner then filed a timely appeal to the Third Circuit Court of Appeals docketed at No. 03-3824. On September 23, 2004, the Third Circuit affirmed this Court's August 28, 2003 Order in a non-precedential opinion.

## Claims Relating Back to Original Habeas Action

8. Before setting forth his claims that relates back to his original June, 2001 habeas action, Petitioner directs this Court's attention to the current stay that has been placed on a

---

[2] Although this Court previously found Mackey's testimony to be insufficient to warrant relief, that determination was made without the benefit of all the evidence in this case, particularly the new evidence that forms the basis for this motion to relate back. As it current stands, Mackey is not the only post-trial witness to claim that Dwayne Bennett acted alone, nor the only witness to have claimed that the Commonwealth has, one way or another, used intimidating tactics to prevent exonerating testimony. This Court should not close its eyes to this factor.

second habeas action under <u>In re: Giovanni Reid</u>, No. 14-109. This particular habeas action raised a claim (amongst others)[3] pursuant to the United States Supreme Court's decision in <u>Miller v. Alabama</u>, 132 S.Ct. 2455 (2012), holding that it is unconstitutional and a violation of the Eighth Amendment's prohibition against cruel and unusual punishment to mandatorily sentence a juvenile offender to life-without-parole.

9. Petitioner hereby incorporates by reference the relevant procedural and factual history as previously set forth in his Petition for Writ of Habeas Corpus - docketed at No. 14-109, dated June 19, 2013, at pp. 1-23. These facts are being incorporated herein as fully set forth thereat.

10. On February 6, 2006, Petitioner became aware of a new piece of evidence strongly suggestive of his innocence. This new evidence was <u>not</u> available to him during his 2001-2004 initial habeas proceedings. The new evidence in question relates to an unsolicited proffer by Robert Janke's roommate, Wayne Richman, stating that he did in fact witness the killing and that Janke was accosted and killed by <u>one gunman</u>, acting alone - as

---

[3] When seeking permission from the Third Circuit Court of Appeals to file a second writ of habeas corpus, in addition to his <u>Miller</u> claim, Petitioner also included his exonerating newly discovered evidence and prosecutorial misconduct claims. <u>See</u> Motion under 28 U.S.C. § 2244 for Order Authorizing District Court to Consider Second or Successive Application for Relief under 28 U.S.C. § 2254 docketed at 13-3076, dated 6/19/13 - p. 5, attached hereto as EXHIBIT A. Also, Petitioner included these claims in his Petition for Writ of Habeas Corpus docketed at 14-109, dated 6/19/13 - p. 22, paragraph 18(a)(b) and f.n. 2-3; <u>also</u> <u>see</u> p. 26, f.n. 5.

4

Petitioner was further down the street yelling out "no" and "don't." See Wayne Richman's Initial E-Mail and Deposition, dated 2/6/06 and 3/13/06, attached hereto as EXHIBIT B.[4]

11. With concerns to this new evidence claim, the state court ordered an evidentiary hearing to be held on March 14, 2007. However, on March 7, 2007, the day before Mr. Richman was scheduled to take a flight from Crossville, Tennessee to Philadelphia, Pennsylvania, he was confronted at his place of business by two (2) Philadelphia Detectives, Mike Cahill and Gerald Lynch. This unexpecting encounter resulted in Mr. Richman's subsequent refusal to come to Philadelphia for the hearing.

12. Specifically, Mr. Richman stated that he was not coming to court because the Detectives had "threatened" him with jail and charges of perjury if he testified.[5]

13. The new exonerating evidence and prosecutorial misconduct claims i.e., threats upon Petitioner's new witness, Mr. Richman are tied to a common core of operative facts that

---

[4] The claim relating to the newly discovered evidence provided by Richman are still pending in the state courts. As of August 3, 2015, Petitioner's case/appeal was submitted to a Superior Court panel. Therefore, in the event of an adverse determination by the state court, the record containing Richman's testimony will be forwarded to this Court for its consideration in relationship to this motion to relate back.

[5] After more than three years and several court filings relating to the compulsory process, Petitioner was able to convince a Tennessee Judge to order Mr. Richman to Philadelphia for his testimony. Richman's testimony was finally taken on November 30, 2010, and again on September 12, 2012.

were raised in the original habeas action docketed at No. 2:01-cv-0285. Therefore, these instant claims directly relates back to the claims that Petitioner raised in his original writ of habeas corpus petition.

14. Pursuant to F.R.C.P., Rule 15(C)(1)(B) it states that:

> (C) Relation Back of Amendments.
>> **(1)(When an Amendment Relates Back).** An amendment to a pleading relates back to the date of the original pleading when:
>> (B) the amendment asserts a claim of defense that arose out of the conduct, transaction, or occurrence set out --- or attempted to be set out --- in the original pleading.

In <u>Mayle v. Felix</u>, 545 U.S. 644 (2005), the United States Supreme Court established guidelines for defining and applying Rule 15(C)(1)(B). In situations where untimely new claims added to a petition by means of Amendment, these claims will "<u>relate back</u>" to the timely original filing and accordingly be deemed timely themselves "[S]o long as the original and amended petition states claims that are tied to a common core of operative facts." But, "[a]n amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those that the original pleading set forth.

15. In addition, Petitioner avers that as a result of <u>all</u> the clear and convincing evidence of his actual and factual

6

innocence, as well as the circumstances surrounding the "threats" upon his witnesses - his conviction for second degree murder has resulted in a miscarriage of justice and a violation of his rights under the Due Process Clause and the Confrontation Clause of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

16. Based on these factors standing along, there are no procedural bars or time-bar limitations to prevent this Court from considering the merits of Petitioner's constitutional claims. See McQuiggin v. Perkins, 133 S.Ct. 1924 (2013)(holding that actual innocence, if proven, serves as a gateway through which a federal habeas corpus petitioner may pass regardless of whether the impediment to consideration of the merits of his constitutional claim is a procedure bar or the expiration of the statute of limitations set by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2244(d)(1)(A), quoting Schlup v. Delo, 513 U.S. 298 (1995), and House v. Bell, 547 U.S. 518 (2006).[6]

---

[6] Upon the exhaustion of state court remedies, and assuming that further litigation will be necessary, Petitioner fully reserves the right to file a supplemental motion addressing the state court's legal and factual determination.

This is important because under AEDPA it permits persons in state custody to file a petition seeking the writ of habeas corpus, 28 U.S.C. § 2254(a), but mandates great deference to state courts' factual findings and legal determinations. See Woodford v. Viscotti, 537 U.S. 19, 24 (2002)(explaining Section 2254(d)'s highly deferential standard for evaluating state court (continued on next page)

7

(continued from preceding page)
rulings) & Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000)(explaining that AEDPA increased the deference federal courts must give to state courts' factual finding and legal determinations).

If a state court adjudicated a habeas petitioner's claims on the merits, then a federal court may not grant relief on those claims unless (1) the state court's adjudication of the claim resulted in a decision contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) the adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(1)(2).

A federal court evaluating a habeas petition may only grant the writ under 28 U.S.C. § 2254(d)(1) if the state court arrived at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decided a case differently than the Supreme Court on a set of materially indistinguishable facts. See Hemeen v. States of Delaware, 212 F.3d 226, 235 (3d Cir. 2000)(citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000)).

An unreasonable application inquiry would require this Court to ask whether the state court's application of clearly established law was objectively unreasonable, id., but an unreasonable application differs from an incorrect application, and relief may not be granted unless the state court's incorrect or erroneous application of clearly established law was also unreasonable. Werts, 228 F.3d at 196.

Also, under 28 U.S.C. § 2254(d)(2), this Court may not grant a state prisoner's application for habeas relief on a claim already adjudicated on its merits in state court unless the adjudication resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Because the federal courts presume a state court's factual determination to be correct absent clear and convincing evidence to the contrary, 28 U.S.C. § 2254(e)(1), an adjudication on the merits in state court based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

To show that a factual determination is objectively unreasonable, a petitioner must show that a reasonable fact-finder would necessarily have to conclude that the state court's determination of the facts was unreasonable. See Rice v. Collins, 546 U.S. 333, 341 (2006), but a state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance, Wood v. Allen, 558 U.S. 290, 301 (2010).

17. Notwithstanding the absence of the state court's legal and factual determination, preliminarily, Petitioner contends that any adverse determinations by the state courts on his newly discovered evidence and prosecutorial misconduct claims as set forth herein would be contrary to, or [based on] an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States and [any] adjudication of these claims has resulted in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)(2).

18. Pursuant to the legal standards as set forth in Schlup v. Delo, 513 U.S. 298 (1995), and House v. Bell, 547 U.S. 518 (2006), it holds that when determining the impact of evidence unavailable at trial, a court must make its final decision based on the likely cumulative effect of the new evidence had it been presented at trial. See Kyles v. Whitley, 514 U.S. 419, 421, 436 (1995)(holding that due process requires a cumulative review of the evidence). Schlup requires a court to call upon and consider all the evidence, **both old and new,** in order to make a probabilistic determination of what a reasonable, properly instructed juror would do. Schlup, 513 U.S. at 315. The appropriate inquiry is whether it is more likely than not that in light of the new evidence no reasonable juror, "conscientiously following the judge's instruction requiring proof beyond a reasonable doubt, would vote to convict." Id.

513 U.S. 316.

19. Under this criteria, and given all the exonerating evidence in this case, **both old and new**, clearly no reasonable jury would have voted to convict Petitioner of second degree murder. This is especially true, when considering the supporting evidence of Petitioner's innocence as described below.

### Additional Supporting Evidence of Petitioner's Actual and Factual Innocence

**A. Crime Scene Evidence**

20. At trial, Petitioner's defense was based on his non-involvement in the robbery and shooting-death of Robert Janke. Through cross-examination, Petitioner's trial attorney tried to establish that he was further up the street and just merely presence when the incident occurred.

21. Contrary to Petitioner's trial defense, the Commonwealth advanced the theory that Petitioner actively participated in this crime by holding Mr. Janke by one of his arms as he was being robbed and ultimately shot and killed by Dwayne Bennett. This theory of prosecution was established through the trial testimony of Lorraine Hill, who specifically testified that [Petitioner] and [Carlton Bennett][7] were standing on either side of Mr. Janke, holding him by his arms when Dwayne Bennett

---

[7] It is important to note here that Petitioner was **never identified** by Ms. Hill. However, she did maintain that the shooter was actively assisted by two accomplices.

10

fired a shot into the right-side of his temple. See N.T. 1/22/93, pp. 57–69, 80, 87–92, 94–95, 112, 128, 130, 132–133.

22. Despite this close proximity theory, there was no evidence showing that Mr. Janke's blood had splattered onto Petitioner or his clothes. What the evidence actually establishes, through Commonwealth's exhibits C-3 and C-4, was that after Mr. Janke was shot by Dwayne Bennett, his blood was splattered onto a steel garage door in an uninterrupted pattern.

23. At trial, the Commonwealth presented the testimony of Officer Anthony Buchanico. Officer Buchanico was the first officer to arrive on scene. According to Officer Buchanico's testimony, exhibits C-3 and C-4 depicts a straight-on, close-up view of the steel garage door where Mr. Janke was shot and found lying on the ground. Officer Buchanico's testimony described the evidence on the garage door as a "smattering of blood." See N.T. 1/21/93, pp. 73–74.

24. In relationship to her testimony, Ms. Hill also provided an in-court demonstration as to how Mr. Janke was being held when he was shot. See N.T. 1/22/93, pp. 63–64 (Mr. McGovern: "Your Honor, for the record, the witness placed -- stood to my right, placed her left arm through my right arm, and then with her left hand, gripped my right wrist"). Because of Ms. Hill's testimony and demonstration in regards how two people had allegedly positioned themselves to interlock theirs arms with Mr. Janke's arms, the blood splatter evidence as depicted in exhibits C-3 and C-4 is highly relevant to Petitioner's claim of innocence.

11

25. Under Schlup v. Delo, supra evidence that a habeas corpus petitioner was aware of but did not present at his trial may be considered by the court in determining whether the petitioner can show "actual innocence" to excuse procedural default. In light of the fact that Schlup does not explicitly state whether the term "newly reliable evidence" refers exclusively to evidence uncovered only after trial, or whether the court may consider evidence that was known to the petitioner at the time of trial but never presented to the trial court, the blood splatter evidence at issue here is properly before this Court for its consideration. This evidence completely supports Petitioner's overall claim of being innocence of any wrongdoing.

26. Significantly, this blood splatter evidence fully corroborates Tyrone Mackey's federal court testimony in regards to Petitioner not being in the vicinity with Dwayne Bennett. Again, Mackey testified from his estimation, that "[Petitioner] had to be at least 15 to 20 feet away." Id. 279 F.Supp.2d at 670. Likewise, this blood evidence also corroborates the newly discovered evidence provided by Wayne Richman, who has stated and testified in state court that Petitioner was further up the street yelling out "no" and "don't." (EXHIBIT B).

27. Against this backdrop, Petitioner contends that the blood splatter evidence would be instrumental to this Court's determination of whose testimony is more likely to fit the verifiable physical facts in this case, Ms. Hill or Mackey and

Richman. First, Petitioner avers that the notion that he would have intentionally stood in a position where he would have been in the direct line of fire with his arm interlocked with Mr. Janke's arm simply defies reason. Secondly, and more importantly, had Petitioner actually done what Ms. Hill testimony suggested, then the blood splatter as found on the garage door should not have been there. According to Ms. Hill, someone was standing in between Mr. Janke and the garage door **"holding him by the arm as he was shot."** Based on the laws of physics, by standing in such a close proximity to Mr. Janke while blocking the space in between him and the garage door, then clearly the blood splatter as depicted in Commonwealth's exhibits C-3 and C-4 should have splattered onto that person as opposed to the door.

28. Under Pennsylvania law we have what is known as the incontrovertible physical fact rule, which establishes that where the testimony of a witness is contradicted by incontrovertible physical facts, the testimony of such witness cannot be accepted, as it being either mistaken or false, and a verdict based on it should not be sustained. Commonwealth v. Widmer, 560 Pa. 308, 744 A.2d 745, 752 (Pa. 2000), holding that, "where testimony [stands] in conflict with [] incontrovertible physical facts and contrary to human experience and the laws of nature it must be rejected" (emphasis added), quoting Commonwealth v. Santana, 460 Pa. 482, 333 A.2d 876, 878 (Pa. 1975)(same proposition).

29. The incontrovertible physical fact rule as it pertains to this blood splatter evidence does not lessen the materiality

13

of Mackey's prior recantation testimony or the newly discovered testimony provided by Richman. In fact, this evidence serves as a means to highlight and highten the reliability of Petitioner's actual innocence claim. Furthermore, it is Petitioner's contention that Mackey's federal court testimony coupled with Richman's state court testimony fits squarely within the verifiable physical facts of this case, far more so than the testimony offered by Lorraine Hill. <u>U.S. v. Green</u>, 180 F.3d 216.

### B. Admissions and Adoption of an Exonerating Statement by the Opposing Party-Opponent

30. During the second state evidentiary hearing, beginning on September 10, 2012, held in relationship to Petitioner's newly discovered evidence claims – the Commonwealth made several admissions and adopted an exonerating statement.

31. On November 7, 2012, during the closing arguments at Petitioner's state hearing, the Commonwealth specifically made the following admissions in the midst of adopting a statement obtained from Dwayne Bennett.

**First Admission:**

> "He (Dwayne Bennett) told the police what really happened that night, which was they all went out looking to rob people. They came upon Robert Janke, planned to rob him. All three of them were down for a robbery. All three of them participated in the robbery. All three of them walked Mr. Janke up the street <u>but Dwayne Bennett blew it at the end when he fired a shot. Nobody anticipated that he was going to do that, certainly not Giovanni and Carlton Bennett. Nobody was down for that but they were down for a robbery</u> and that is what he told police

14

and that is what makes sense in this case, Your Honor." (Emphasis added)

See Transcripts from State Evidentiary Hearing, 11/7/12 - p. 103, attached hereto as EXHIBIT C.

32. Here, the Commonwealth admits that Dwayne **"blew it"** by firing a shot at the **"end"** of the robbery and that Petitioner was not **"down"** for a shooting and did not **"anticipate[]"** Dwayne's actions in this regard.

**Second Admission:**

> "The bottom line in the case, Your Honor, is that by Dwayne Bennett doing what he did, and I think is it probably true that Carlton Bennett and Giovanni Reid had no reason to suspect that Dwayne Bennett was going to kill Robert Janke - I do think that is probably true. Your Honor, I can't get inside their head but it is reasonable to assume they did not know but for Dwayne Bennett's actions these young men would have done a 5 to 10 year sentence and they would be on the street right now living their lives and it is only because of Dwayne Bennett's actions that all three of them are now serving life sentences." (Emphasis added)

EXHIBIT C, p. 113-114.

33. In conjunction with the admission set forth above, the Commonwealth further admits that Petitioner **"had no reason to suspect that Dwayne Bennett was going to kill Robert Janke."**

**Adoption of Dwayne Bennett's Statement:**

> "What I [Detective Edward Rocks] recall is that Dwayne told me the following: All three of us had guns. Dwayne Bennett put the gun to his head while the other two

> were going through his pockets. We all knew
> about the robbery. <u>What we all didn't know
> was that I was going to shoot and kill Robert
> Janke when [the robbery was over</u> and that,
> Your Honor, <u>is the truth. That's what
> happened in this case and it is a tragedy.</u>"

EXHIBIT C, pp. 118-120

34. After recalling Dwayne's statement as given to Detective Rocks, the Commonwealth clearly adopted this statement by stating to the PCRA court **"and that, Your Honor, is the truth. That's what happened in this case and it is a tragedy."**

35. These admissions and the adoption of Dwayne Bennett's statement substantiates that Petitioner is not criminally liable for the shooting-death of the Robert Janke - as his death did not occur <u>in the course of</u> or <u>in furtherance of</u> the underlying felony i.e., robbery - a factor that is necessary for a person to be convicted of second degree murder. <u>See</u> <u>Simmons v. Love</u>, 1996 U.S. App. LEXIS 34786 1996), where facts establishes that homicide was committed as an independent act by one of the co-conspirators after the robbery was completed while the remaining individuals were walking away, but still present on the scene.

36. Moreover, Pursuant to F.R.E., Rule 801(d)(2) admissions and adoptive admissions by a party-opponent are admissible as non-hearsay if the statement offered against the party is "the party's own statement . . . [or] a statement of which the party has manifested an adoption or belief in its truth. F.R.E., 801(d)(2)(A), (B). "Adoption can be manifested by any appropriate means, such as language, conduct, or silence . . .. If the

16

statements are viewed as the defendant's own, they constitute admissions properly characterized as non-hearsay under Rule 801(d)(2)." Horvath v. Rimtec Corp., 102 F.Supp.2d 219, 223 (D.N.J. 2000), citing Neuman v. Rivers, 125 F.3d 315, 320 (6th Cir. 1997).

37. Detective Rocks' testimony of what Dwayne told him is not hearsay and is admissible as an admission by a party-opponent, particular since Detective Rocks was an agent working on behalf of the respondent District Attorney's Office when the statement was made. Rule 801(d)(2).

38. As with the crime scene evidence, likewise, Petitioner contends that the Commonwealth's admissions and the adoption of Dwayne Bennett's exonerating statement only adds to his overall claim of being actually and factually innocence of second degree murder. Therefore, Petitioner's continued incarceration is a miscarriage of justice and violative of his rights under the Fourteenth Amendment's Due Process Clause to the United States Constitution.

## New Matters

## A. Judicial Notice of Adjudicative Facts

39. In order for Petitioner to put the full range of his "actual innocence" claim in the proper perspective, he has simultaneously filed a motion pursuant to F.R.E., Rule 201 – requesting this Court to take judicial notice of adjudicative facts, which are a part of the record evidence in this matter. See Motion Requesting Court to Take Judicial Notice of Facts. . .

17

Under F.R.E. 201(a)(b)(2)(c)(2)(d)(e), 9/1/15.

## B. Motion for Partial Summary Judgment

40. In conjunction with Petitioner's motion to relate back to his original habeas action, he has also filed a motion for partial summary judgment pursuant to F.R.C.P., Rule 56(a). Rule 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. . .." Given the Commonwealth's judicial admissions and the adoption of an exonerating statement provided by Dwayne Bennett as set forth above, clearly Petitioner is entitled to relief as a matter of law. Therefore, this motion requesting partial summary judgment is properly before this Court for its consideration. See Motion for Partial Summary Judgment and Consolidated Memorandum of Law in Support, 9/1/15.

### Request to Stay and Hold this Motion in Abeyance

41. Petitioner's second PCRA petition filed pursuant to 42 Pa.C.S. § 9541 et seq. is currently pending in the Pennsylvania Superior Court under Docket No. 1980 EDA 2014. Petitioner is seeking relief from his confinement as a result of the judgment of sentence entered in the Court of Common Pleas of Philadelphia County, Pennsylvania, on June 23, 1993, Docket No. CP-51-CR-0933293-1991. In his PCRA petition as well as his

18

appeal before the Superior Court, Petitioner asserts that he is actually innocence of any criminal wrongdoing and that there are prosecutorial misconduct issues relating to governmental interference with defense witness, Wayne Richman. The actual innocence claim was initially filed on March 31, 2006, and Amended on May 27, 2009 to include the issue of prosecutorial misconduct. Because Petitioner's claims are still pending in the state courts he respectfully moves the Court for a Stay of the instant proceeding until his state remedies are fully exhausted. See Pace v. Diguglielmo, 544 U.S. 408, 417-419 (2005)(rejecting both statutory and equitable tolling arguments by prisoner whose PCRA was held untimely, and who attempted to file a federal habeas action only after the PCRA was finally litigated; Rhines v. Weber, 544 U.S. 269, 125 S.Ct. 1528, 1531, 161 L.Ed.2d 440 (2005)(relating to the filing of "protective" petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted); also see Merritt v. Blaine, 326 F.3d 157, 170 n. 10 (3d Cir. 2003) (recommending suspense procedure pending exhaustion of claims in state court); Crews v. Horn, 360 F.3d 146 (3d Cir. 2004)(same proposition).

## Conclusion

WHEREFORE, Petitioner Giovanni Reid, respectfully request that the writ of habeas corpus be issued on one or more of his constitutional claims, particularly given the collective evidence, both old and new, which substantiates his claim of actual and factual innocence.


Respectfully submitted,

**GIOVANNI REID**, Petitioner
Inst. #: CA-0466
P.O. Box 244
Graterford, PA 19426


Dated: September 1, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GIOVANNI REID,              :     CIVIL ACTION
                Petitioner  :
                            :     NO. 2:01-cv-02385
          V                 :        (prior habeas action)
                            :
DONALD VAUGHN, et al.,      :
                Respondents :
_____:

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving a true copy of the foregoing MOTION upon the following person(s) and in the manner of service as indicated below:

Thomas Dolgenos, Esquire
Chief, Federal Court Litigation Unit
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499
(via U.S. Mail, First-Class,
  Postage Prepaid)

**GIOVANNI REID, Petitioner**

Dated: September 1, 2015

**EXHIBIT**

**A**

**MOTION UNDER 28 U.S.C. § 2244 FOR ORDER AUTHORIZING DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE APPLICATION FOR RELIEF UNDER 28 U.S.C. § 2254**

**DOCKETED AT: 13-3076, JUNE 19, 2013**

United States Court of Appeals for the Third Circuit

| Name of Movant<br>GIOVANNI REID | Prisoner Number<br>CA-0466 | Case Number _13- 3076_<br>(leave blank) |
|---|---|---|
| Place of Confinement<br>SCI-GRATERFORD | | |

IN RE: GIOVANNI REID          , MOVANT

1. Name and location of court which entered the judgment of conviction from which relief is sought: _____

Court of Common Pleas - Philadelphia County - 1301 Filbert Street

2. Parties' Names: __Commonwealth__ vs. __Giovanni Reid__

3. Docket Number: __CP-51-CR-0933203-1991__ 4. Date Filed: __August 19, 1991__

5. Date of judgment of conviction: __Jan. 27, 1993__ 6. Length of sentence: __Life__

7. Nature of offense(s) involved (all counts): __Second Degree Murder, Robbery and__

__Conspiracy.__

8. What was your plea? (Check one)   ☑ Not Guilty   ☐ Guilty   ☐ Nolo

Contendere

9. If you pleaded not guilty, what kind of trial did you have? (Check one)   ☑ Jury   ☐ Judge

only

10. Did you testify at your trial? (Check one)   ☐ Yes   ☑ No

11. Did you appeal from the judgment of conviction? (Check one)   ☑ Yes   ☐ No

12. If you did appeal, what was the

Name of court appealed to: __Pennsylvania Superior Court (Direct Appeal).__

Parties' names on appeal: __Commonwealth__ vs. __Giovanni Reid__

Docket number of appeal: __2151 PHL 93__ Date of decision: __Feb. 17, 1994__

Result of appeal: __Denied (Lower Court Judgment Affirmed).__

13. Other than a direct appeal from the judgment of conviction and sentence, have you filed any other petitions, applications for relief, or other motions regarding this judgment in any federal court? ☑Yes ☐ No

14. If you answered "yes" to question 13, answer the following questions:

A. FIRST PETITION, APPLICATION, OR MOTION

(1) In what court did you file the petition, application, or motion? U.S. District Court, #E.D.

(2) What were the parties' names? __Reid__ vs. __Vaughn__

(3) What was the docket number of the case? __C.A.01-2385__

(4) What relief did you seek? __New Trial__

(5) What grounds for relief did you state in your petition, application, or motion? __1. Failure__ by the Commonwealth to Disclosed favorable material/exculpatory evidence pursuant to Brady v. Maryland (1963), a. Benefits given to Commonwealth witnesses; b. Exculpatory statement made by prosecution witness prior to trial testimony. 2. Prosecutorial misconduct, i.e. threatening witness.

(6) Did the court hold an evidentiary hearing on your petition, application or motion? ☑Yes

☐ No

(7) What was the result? ☐ Relief granted ☑Relief denied on the merits

☐ Relief denied for failure to exhaust ☐ Relief denied for procedural default

(8) Date of court's decision: __August 27, 2003__

B. SECOND PETITION, APPLICATION, OR MOTION

(1) In what court did you file the petition, application, or motion? __Common Pleas Court__

(2) What were the parties' names? __COmmonwealth__ vs. __Giovanni Reid__

(3) What was the docket number of the case? __CP-51-CR-0933203-1991__

(4) What relief did you seek? __New Trial/Resentencing__

C. THIRD AND SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS

For any third or subsequent petition, application, or motion, attach a separate page providing the information

required in items (1) through (8) above for first and second petitions, applications, or motions.

D. PRIOR APPELLATE REVIEW(S)

Did you appeal any order regarding your petitions, applications, or motions to a federal court of appeals having jurisdiction over your case? If so, list the docket numbers and dates of final disposition for all subsequent petitions, applications, or motions filed in a federal court of appeals.

First petition, application, or motion   ☑ Yes   Appeal No. <u>03-3824</u> Date <u>9/29/04</u>  ☐ No
Second petition, application, or motion   ☐ Yes   Appeal No. _____ Date _____  ☐ No
Subsequent petitions, applications or motions   ☐ Yes   Appeal No. _____ Date _____  ☐ No
Subsequent petitions, applications or motions   ☐ Yes   Appeal No. _____ Date _____  ☐ No
Subsequent petitions, applications or motions   ☐ Yes   Appeal No. _____ Date _____  ☐ No
Subsequent petitions, applications or motions   ☐ Yes   Appeal No. _____ Date _____  ☐ No
Subsequent petitions, applications or motions   ☐ Yes   Appeal No. _____ Date _____  ☐ No

If you did not appeal from the denial of relief on any of your prior petitions, applications, or motions, state which denials you did not appeal and explain why you did not.

**Appeal taken on all claims**

_____

_____

_____

15. Did you present any of the claims in this application in any previous petition, application, or motion for relief under

28 U.S.C. § 2254 or § 2255? (Check one)     ☐ Yes       ☑ No

16. If your answer to question 15 is "yes," give the docket number(s) and court(s) in which such claims were raised and state the basis on which relief was denied.

**Not Applicable**

_____

_____

_____

17. If your answer to question 15 is "No," answer the following questions:

A. State the claims which you did not present in any previous petition, application, or motion for relief under

28 U.S.C. § 2254 or § 2255: <u>1. Newly Discovered Evidence Claim of Actual Innocence</u>

<u>2. Prosecutorial Misconduct/Interference with Defense Witness. See Attachment B</u>

4

QUESTION B, PAGE 3 (CONTINUED)


1. Common Pleas Court.

2. Commonwealth v. Giovanni Reid.

3. CP-51-CR-0933203-1991.

4. New Trial and Resentencing.

5. (1) Unavailable at the Time of Trial of Exculpatory Evidence That Has Subsequently Become Available and Would Have Change That Outcome of the Trial if it had Been Produced – Testimony of Wayne Richman and Recantation by Dwayne Bennett; (2) Constitutional Violation Undermining the Truth-Determining Process – Prosecutorial Misconduct/Interference with Defense Witness; (3) Unconstitutional (Mandatory LIFE) Sentence for Juvenile Pursuant to <u>Miller v. Alabama</u>, 132 S.Ct. 2455 (June 25, 2012).

6. Evidentiary Hearing Held.

7. Still Pending in State (Lower Common Pleas) Court and Waiting for Decision from the Pennsylvania Supreme Court in <u>Commonwealth v. Cunningham</u>, 38 EAP 2012.

8. No Decision Rendered as of this date (June 19, 2013).

QUESTION 17, PAGE 4 (CONTINUED)

3. Unconstitutional (Mandatory LIFE) Sentence for Juvenile
Pursuant to <u>Miller v. Alabama</u>, 132 S.Ct. 2455 (June  25, 2012).
See Attachment A, Answer # 5 — which is being fully Incorporated
herein as stated thereat).

**\*NOTE: This Court will grant you authority to file in the district court only if you show that you could not have presented your present claims in your previous § 2254 or § 2255 application because . . .**

    **A. (For § 2255 motions only)** the claims involve "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [you] guilty"; or,

    **B. (For § 2254 petitions only)** "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [you] guilty of the offense"; or,

    **C. (For both § 2254 and § 2255 applicants)** the claims involve "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court [of the United States], that was previously unavailable."

**State how you meet the above requirements:**

I discovered new exculpatory evidence on Feb. 6, 2006, from Mr. Wayne Richman who was

the friend and roommate of the victim. He came forward unsolicited when he learned that

there were three people arrested instead of one. I never knew Mr. Richman witnessed the

incident that took his roomates life. Prosecutor/Detective threatened Mr. Richman prior

to the testimony he was scheduled to give at my evidentiary hearing on March 14, 2007.

See Attachment C.

**If it has been more than one year since either (1) your conviction became final; (2) you discovered the new evidence on which you rely; or (3) the United States Supreme Court case on which you rely was decided, state why you could not file your petition earlier:**

For my new evidence claim and Prosecutorial Misconduct claim those claims are still

pending in the state court. I did not raise them within a year of me discovering them

because these claims "Relate Back" to my pervious federal appeal pursuant to Rule 15(c).

As for the claim pursuant to Miller v. Alabama, (2012), I am raising this claim within

the one-year deadline from when the U.S. Supreme Court issued its decision on June 25, 2012.

    Movant prays that the United States Court of Appeals for the Third Circuit grant an Order Authorizing the District Court to Consider Movant's Second or Successive Application for Relief Under 28 U.S.C. §§ 2254 or 2255.

*Giovanni Reid*
**Movant's Signature**    6/19/13

QUESTION STATING "HOW YOU MEET THE ABOVE REQUIREMENTS, PAGE 5 (CONTINUED)

Prevented Mr. Richman's initial testimony at evidentiary hearing in March, 2007, and June, 2007. Additional new evidence in the form of an Exculpatory Affidavit dated, February 7, 2008, was obtained from Dwayne Bennett who came forward only after learning that Mr. Wayne Richman had come forward as a new witness. None of this new evidence was known nor could it have been discovered with the exercise of due diligence. All of this evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact-finder would have found Petitioner guilty. (NOTE: Commonwealth conceded for the first time that Petitioner did not play an active role in the shooting death of Mr. Robert Janke during their closing arguments at Petitioner's evidentiary hearing held on November 7, 2012). These claims "Relate Back" to Petitioner previous claims that were presented to the District Court and the Court of Appeal for the Third Circuit during Petitioner's first Writ of Habeas Corpus Appeal (Filed May, 2001 to September, 2004). The United States Supreme Court issued their decision in <u>Miller v. Alabama</u>, 132 S.Ct. 2455, on June 25, 2012, holding that the imposition of a mandatory sentence of life without parole is unconstitutional where the defendant was a juvenile at the time of his offense. The <u>Miler</u> decision represents a new rule of constitutional law that has been held retroactively by the U.S. Supreme Court when they decided the companion case of <u>Jackson v. Hobbs</u>, which was a case arising out of a State Collateral proceeding in Arkansas. At the time of Petitioner initial Federal Appeal, the <u>Miller</u> decision was unavailable.

# PROOF OF SERVICE

A copy of this motion and all attachments must be sent to the state attorney general (§ 2254 cases) or the United

States Attorney for the United States judicial district in which you were convicted (§ 2255 cases).

I certify that on _____6/19/13_____ I mailed a copy of this motion and all attachments
[date]

to _____Mr. Thomas Dolgenos, Esq. - Chief of Federal Litigation Unit_____ at the following address:

D.A.'s Office - Three Penn South Squre - Phila, PA. 19107-3499

Rev. 2/99

Movant's Signature

6/19/13

6

EXHIBIT

B

WAYNE RICHMAN'S INITIAL E-MAIL AND DEPOSITION

DATED: FEBRUARY 6, 2006 AND MARCH 13, 2006

RESPECTIVELY

Subject: info
From:   "wayne richman" < wr1228us@yahoo.com>
Date:   Mon, February 6, 2006 11:39 am
To:     giovanni@giovannireid.com

i don't want to say much right now, but i do have a
little bit of information about your case.

btw i was roberts roomate at the time of his murder
and was on naudain st looking towards south after you
guys walked by. the police never came to question me
and i didn't give my identity because bob didn't want
his family to know he was gay and i was afraid it
would come out if i came forward

77a

## Page 1

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, )
    Plaintiff, )
vs. )CASE NO: C.P.9109-3334-3340
     )
GIOVANNI REED, )
    Defendant. )
_____)

APPEARANCES:
    FOR THE PLAINTIFF:
    None Present

    FOR THE DEFENDANT:
    Kevin V. Mincey, Esquire
    Law office of Kevin V. Mincey
    1616 Walnut Street, Suite 700
    Philadelphia, Pennsylvania 19103

    ALSO PRESENT:  LaTasha Williams

VIDEO DEPOSITION OF
WAYNE EDWARD RICHMAN
MARCH 13, 2006

*******************************************
PRECISE REPORTING, INC.
Nella Robin Vargas, A.S.
Post Office Box 20433
Knoxville, TN 37940-1433
(865) 908-6565

## Page 2

INDEX

WITNESS:                          PAGE
WAYNE EDWARD RICHMAN,
    Direct Examination by Mr. Mincey          4


EXHIBITS

EXHIBIT NO.     DESCRIPTION     PAGE
None Offered.

## Page 3

STIPULATION

The deposition of WAYNE EDWARD RICHMAN, called as a witness at the instance of the DEFENDANT for any and all purposes, pursuant to all rules applicable under the Tennessee Rules of civil Procedure, taken by agreement on the 13TH day of MARCH, 2006, beginning at approximately 1:00 p.m. at The Country Inn Suites, 162 Cusick Road, Alcoa, Tennessee, before Nella Robin Vargas, Court Reporter and Notary Public at Large, pursuant to stipulation of counsel.

It being agreed that Nella Robin Vargas, Court Reporter and Notary Public at Large, may swear the witness, report the deposition in machine shorthand and afterwards reduce the same to typewritten form.

All objections except as to the form of the question are reserved to on or before the hearing.

All formalities as to caption, certificate, transmission, et cetera, are expressly waived.

It was further stipulated and agreed by and between counsel that said witness shall not read and sign the deposition before filing.

## Page 4

WAYNE EDWARD RICHMAN, was called as a witness on behalf of the Defendant and, after having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MINCEY:

Q   Could you state your name and spell your last name for us?

A   Wayne Edward Richman, R-I-C-H-M-A-N.

Q   What is your date of birth, Wayne?

A   12/28/69.

Q   Where do you reside right now?

A   138 Cardinal Loop, Crossville, Tennessee.

Q   Okay.  And taking you back to August 10, of 1991, where were you living at that time?

A   17th and Naudain.

Q   Okay.  Did you live with anyone there?

A   Yes.  I lived with Robert Janke.

Q   Okay.  And the night of August 10, of 1991, where were you that night?  Let me take you back to, say, like, around midnight of that night, where were you?

A   I was at a party, uh, Michael Whiteman.  It was a housewarming party.  On this paper here, it says, it was 927 Spruce Street.  So I am assuming it was 927 Spruce Street.

Page 5

1    Q   Just so we can make the record clear, that paper
2  that you are referring to, that is an interview record
3  from the Philadelphia Police Department taken around the
4  time of this incident; is that right?
5    A   Right.
6    Q   Okay.  And if you can, I just want you to answer
7  the questions without really having to refer to the paper
8  at this time.  But if you need to, just let us know, and
9  we'll let you look down -- look down at your statement
10  that you gave the police back in 1991.  But I want you to
11  testify as much as possible off of your own recollection,
12  can you do that for me?
13    A   Yes. I can.
14    Q   All right.  Was Robert at that party?
15    A   Yes.
16    Q   Okay.  You saw him there?
17    A   Yes. I did.
18    Q   Okay.  Did you go there together?
19    A   No.
20    Q   All right.  About what time, if you can
21  remember, did you leave that party?
22    A   I really don't know.  Uh, it had to be after
23  3:00.  I would say, somewhere close to 4:00.
24    Q   Okay.  And after you left that party, where did
25  you go?

Page 6

1    A   I went home.
2    Q   Okay.  And that was 517 Naudain Street?
3    A   Right.
4    Q   All right.  Is that an apartment or a house?
5    A   That is an apartment.
6    Q   Okay.  What floor did you live on?
7    A   Third.
8    Q   Okay.  Something happened to Robert that night.
9  He was shot.  Can you tell me what you remember about that
10  night?
11    A   Like I said, I heard the doorbell ring.  But
12  it -- I mean, it had been ringing a little while.  I know
13  I was passed out.  I used to sleep in the living room.  I
14  had the pull-out thing on the floor.  And, uh, I heard the
15  doorbell ring.  By the time I finally got up enough energy
16  to get up and go look, there was nobody there.
17    Uh, what I did was, I went to a window, and I looked
18  down to the street to see if I could see by the door.  I
19  didn't see anybody, so I went out back on the patio,
20  leaned over, and looked down at the door, which would have
21  been to my left, and I didn't see anybody.  So I went to
22  the front of the building, which was the bedroom area.  I
23  went to the window.  When I opened the door, I could hear
24  voices.  The window was open and the screen was shut.  I
25  saw six guys walk by.

Page 7

1    Q   Okay.  When you say, you saw six guys, were
2  those white males, black males, or Asian males?
3    A   They were black males.  I'm sorry.
4    Q   Okay.  About how old did they look, if you
5  remember?
6    A   They were like between the ages of, like,
7  probably, fifteen and twenty, twenty-one.
8    Q   Okay.  And what, if anything, did you see those
9  males doing on that night?
10    A   They were just -- when I saw seem, like, outside
11  the window, they were just cutting up.  Three of them were
12  in a group.  They went walking down the street.  They were
13  probably, I don't know, maybe, twenty to -- no, probably
14  about fifty feet ahead of the other three.
15    Q   Okay.
16    A   Uh, in the second set of three, I know there was
17  two dark-skinned guys, and there was a light-skinned guy.
18    Q   Okay.
19    A   The light-skinned guy looked pretty young.
20    Q   Okay.
21    A   There was a few minutes there that I know I
22  just, like, said, you know, I don't know what.  But
23  something made me run out the door and go down the steps
24  out to the sidewalk.  And I can tell you that what -- I
25  was drunk at the time.  I won't lie.  I was drunk at the

Page 8

1  time.  When I'm drunk, I don't let things go.  I know
2  there was somebody ringing that doorbell, so I kept trying
3  to find out which it was and why.  So that's why I went
4  downstairs out onto the street.  Because when I am drunk,
5  it's just, like, you know, I just have -- I can't let
6  things go.  I have to do it, and, uh --
7    Q   And when you went down on the street, did you
8  see anything?
9    A   I saw a scuffle.  I went out to the corner, and
10  I stood, like, on this little pad that was the corner of
11  the building.  The corner was, kind of, like, missing on
12  the bottom floor.
13    Q   Uh-huh.
14    A   And I could stand on that pad where -- I looked
15  around the corner, and the first set of three guys, they
16  were, like, way up the street.  I mean, they were almost
17  out of my sight, not out of my sight, but out of view,
18  because it was dark.
19    Q   Right.  Were there any street lights out there?
20    A   Uh, there were some orange lights, because there
21  was a parking garage.  I know there was orange lights, I
22  believe, in that parking garage.  You could see orange on
23  that corner.
24    Q   Okay.  But, uh --
25    A   From what I can remember.

| Page 9 |
|---|

1     Q  Okay.
2     A  I'm not positive. But I'm almost -- I just
3 envision it -- it was orange.
4     Q  And while you were looking down the street at
5 the males, what were they doing, if anything?
6     A  Well, the corner was lit pretty well. I could
7 see the corner. It was beyond the corner where the first
8 set of three guys was.
9     Q  Okay.
10     A  Uh, as I looked down, I saw a car drive by. I
11 believe, if I'm not mistaken, it drove down South Street,
12 like, from 18th and went down 17th towards, I think,
13 that's Kater Street.
14     Q  Okay.
15     A  I'm not positive on which direction the car was
16 going though or which direction it came from.
17     Q  Uh-huh.
18     A  But that's just what my memory tells me, is that
19 it went -- I know it went towards Kater Street. It didn't
20 go, like, down South?
21     Q  Right. And the males, what were they doing?
22     A  Uh, the three that were further ahead, I could
23 hear them, like, making a bunch of noise. But I don't
24 really know what they were doing.
25     Q  Uh-huh.

| Page 10 |
|---|

1     A  The other three that were back into my view, one
2 of them was standing in front of Bob. That's when I
3 noticed that Bob was there.
4     Q  Okay.
5     A  I, kind of, heard what sounded like Bob
6 whimpering, so I figured there was a problem. That's why
7 I, kind of, like, stayed back, and I didn't say anything
8 out loud.
9     Q  When you are talking about Bob -- when say, Bob,
10 you are talking about Robert Janke?
11     A  Yeah, Robert, I'm sorry. Uh, I was scared.
12     Q  Okay.
13     A  You know, because I --
14     Q  What made you scared?
15     A  He was whimpering. I'd never heard him do that
16 before
17     Q  Okay. So what --
18     A  So I knew there was a problem. I knew he was
19 probably getting robbed. And that kind of thing had
20 happened to me before, so I was -- I mean, I was
21 terrified, and I just froze.
22     Q  Let me ask you this, how many people did you see
23 around Bob at this point?
24     A  There was three in the vicinity of him, one on
25 him.

| Page 11 |
|---|

1     Q  When you say, on him, can you describe what you
2 mean by, on him?
3     A  Like, right up, like, as close as I am to this
4 lady here.
5     Q  Okay. About two feet?
6     A  If not closer.
7     Q  Maybe a little bit less than that. Uh, can we
8 move the camera, so we can tell the distance?
9     MS. WILLIAMS: Absolutely.
10     THE WITNESS: The other two were about twenty
11 feet away.
12 BY MR. MINCEY:
13     Q  Okay. Uh, they were --
14     A  They were headed in the same direction the first
15 three went.
16     Q  Okay.
17     A  Like towards Kater Street.
18     Q  Walking away from Bob?
19     A  Yeah.
20     Q  Okay.
21     A  But, turning back, I remember one thing. To me,
22 I heard somebody say, "don't."
23     Q  Uh-huh.
24     A  That's all I remember.
25     Q  Do you know who said that?

| Page 12 |
|---|

1     A  The light-skinned guy, I believe.
2     Q  Okay.
3     A  I mean, him and the other guy were, kind of,
4 close together.
5     Q  Uh-huh.
6     A  But it's hard to tell. I mean, that's what,
7 seventy-five, a hundred feet away, maybe.
8     Q  Fair enough. And what did you -- the guy who
9 was on Bob, what did you see him do?
10     A  He shot him.
11     Q  Okay, uh --
12     A  I could see he was holding his hand towards
13 Bob's head. I couldn't tell that it was a gun. I heard
14 the noise.
15     Q  And how many noises did you hear?
16     A  I only remember hearing one shot.
17     Q  Okay. After the one shot, what happened next?
18     A  I just --
19     Q  Did you see where the boys went, if anything?
20     A  No. I know they ran, just because they were out
21 of the area quick. I was scared to death. I looked
22 around one more time and saw that -- somebody came up that
23 way. I went back upstairs, and I passed out for about six
24 hours.
25     Q  Okay. When you woke up, what happened then?

Page 13

1   A   I woke up to the phone --
2   Q   Okay.
3   A   -- ringing.
4   Q   And who was on the phone?
5   A   That would have been Robert's cousin. I do not
6   recall her name. But I know that she lived in
7   Philadelphia at the time.
8   Q   Okay. And is that who told you, uh --
9   A   That something happened, yeah.
10  Q   Okay.
11  A   I told her, I didn't know.
12  Q   All right. Did you ever talk to the police
13  about this?
14  A   It says here that I did, but I don't remember
15  it.
16  Q   Okay. And, again, when you say, it says here,
17  we are talking about your signed statement, given to the
18  police department?
19  A   On the paper that you referred to before. I do
20  not remember that.
21  Q   Okay. Did you ever tell anybody what you saw?
22  A   Until I'm telling you, no.
23  Q   Okay.
24  A   Well, I told LaTasha on the phone.
25  Q   Right, uh --

Page 14

1   A   I never even told the person I have lived with
2   for the past fourteen years.
3   Q   Right. Just give me one second here. After
4   this happened, did you stay in Philadelphia?
5   A   For a little while.
6   Q   When you say, a little while, can you --
7   A   About four months.
8   Q   Okay.
9   A   I left for about six months and came back for,
10  like, three more months.
11  Q   When you say, you left, you moved out of the
12  city?
13  A   Yes.
14  Q   Okay, out of the state?
15  A   Yes.
16  Q   Okay. When you came back, did you live in the
17  city again?
18  A   Yeah, for like, three months. I lived at 13th
19  and South for about three weeks, and then I moved to --
20  what is it? It was up towards Fishtown.
21  Q   But it was --
22  A   Burkes rings out in my mind.
23  Q   But it was in the city though?
24  A   Yeah. It was, like, one block from the El
25  Station at Burkes Street.

Page 15

1   Q   Okay.
2   A   Front and Burkes, somewhere around there.
3   Q   Okay. When was the last time that you lived in
4   Philadelphia?
5   A   September of 1992.
6   Q   Okay. Did the police ever attempt to follow-up
7   on the initial interview, if you can recall, that you gave
8   on that piece of paper right there?
9   A   Never once.
10  Q   Did anybody ever try and contact you regarding
11  this case?
12  A   Never. Never. I spoke to one person on my own,
13  you know, just somebody that I knew. And I happened to
14  see them out one night, and I just asked if they knew what
15  happened. And they told me, the person that did it
16  confessed and was in jail. And that's all I knew. I left
17  it alone.
18  Q   And do you know who that person was? Can you
19  give us that name?
20  A   No.
21  Q   No you don't remember, or know you don't know
22  it?
23  A   I don't know it. I mean, I was never told.
24  Q   Okay.
25  A   I never looked in the newspaper. I never --

Page 16

1   nobody gave me the name. They just said, somebody
2   admitted to it. I believe, they said he was, like,
3   twenty-one or twenty-three years old. That's all I knew.
4   Q   Okay. And December of '92 -- not December of
5   '92. When did you say you left?
6   A   September of '92.
7   Q   September of '92, you left. And you have been
8   living outside Philadelphia ever since?
9   A   Yes. I moved to Bucks County until, uh,
10  sometime in '94. And then I lived in Browns Mills, New
11  Jersey and moved to Crossville, Tennessee -- I can tell
12  you exactly when, December 28, which is my birthday. 1995
13  is when I got to Crossville, Tennessee.
14  Q   Okay. How did you find out about -- how did you
15  find out -- what led you to look into Robert's case?
16  A   Curiosity. Uh, I actually wanted to try to get
17  in contact with somebody that I used to work with. And
18  it's a girl that, uh, I actually, uh, went to high school
19  with too. I just wanted to get in contact with her. I
20  knew her mother. I knew her sister.
21  Q   What was her name?
22  A   Mary Ann Palone (phonetic).
23  Q   Okay.
24  A   She worked with us at TGI Fridays.
25  Q   Okay.

Page 17

1    A   And I was just going through different things,
2   and then I was trying to find out different things and see
3   if I could get ahold of her. Well, I knew there was a
4   girl that knew her, which is a girl named Elizabeth,
5   that's referred to on this statement that we've referred
6   to before. And, uh, so I figured I'd try to find out how
7   to get ahold of her, but I couldn't remember her last
8   name.
9    Q   Right.
10   A   So then I typed in Robert's name, and Giovanni's
11  name came up on the search.
12   Q   Okay.
13   A   Well, of course, I was curious. I wanted to see
14  what it said. So I read it. And as I was reading it, it
15  just -- things in it did not ring true to me at all.
16   Q   Okay.
17   A   But never having come forward before, I didn't
18  really know what to do. But I asked somebody what I
19  should do, and they said that I should leave a message on
20  the site.
21   Q   On the web site?
22   A   Yes. So I did.
23   Q   And the web site we are referring to is
24  WWW.GIOVANNIREED.COM?
25   A   Right.

Page 18

1    Q   Okay. Wayne, have you received any compensation
2   for this testimony you are giving here today?
3    A   From who? No.
4    Q   Okay. For the record, we are in Knoxville,
5   Tennessee.
6        MS. WILLIAMS: Did you ask him if he saw anyone
7   in the vicinity, anyone else?
8   BY MR. MINCEY:
9    Q   Yeah. Let me ask you this, taking you back to
10  when Robert was shot, was there anyone else on the block
11  that night?
12   A   No. I told you, I saw six people, total.
13   Q   Six people total. Uh, was it six people total,
14  or seven people, six people and then one, including
15  Robert?
16   A   Well, Robert, yeah.
17   Q   Robert was number seven?
18   A   But not another, not an eighth person.
19   Q   Okay. Was there anything obstructing your view
20  when you were looking from the patio down the street?
21   A   The only thing that was obstructing my view, was
22  like distance. But there wasn't enough distance where I
23  couldn't see what was going on.
24   Q   Okay.
25   A   There wasn't enough distance where I couldn't

Page 19

1   see where people were placed.
2    Q   Okay. There is a computer sitting in front of
3   you. We have a web site up. Can you say, what that web
4   site is?
5    A   It's Windows Live Local.
6    Q   If we could -- maybe we can bring the camera
7   around here and try and get, uh --
8    A   I think if you hold it further away and zoom in,
9   it will show it better than if you went up close to it.
10       MR. MINCEY: Can you get a picture of that,
11  LaTasha?
12       MS. WILLIAMS: Uh-huh.
13       THE WITNESS: It will be grainy if you get too
14  close.
15       MR. MINCEY: Why don't you step around here.
16  Obviously, try and not obstruct the view of the
17  camera, but if you can just show us where everything
18  was that night. And we will give the street names,
19  so we can make sure we put it on the record.
20       THE WITNESS: Am I in your way?
21       MS. WILLIAMS: No, not at all.
22       THE WITNESS: This right here is 17th Street.
23  This is Naudain.
24       MR. MINCEY: 17th Street runs north and south.
25       THE WITNESS: Rodman, Naudain and Rodman run

Page 20

1    east to west, South Street. And the corner in
2    question is, like, right there.
3   BY MR. MINCEY:
4    Q   Just off -- right on your screen or just off the
5   screen?
6    A   It's right at the edge of the screen.
7    Q   And where is your apartment building on the
8   screen?
9    A   It is right there, the light one that I am
10  pointing to.
11   Q   Okay. And that's 517 South Naudain Street?
12   A   Right.
13   Q   Okay.
14   A   Well, I don't remember the address, but --
15       MS. WILLIAMS: South 17th Street.
16       MR. MINCEY: South 17th Street, I apologize.
17  BY MR. MINCEY:
18   Q   If you could just show us where you were
19  standing to be able to look down the street.
20   A   I don't know how well you can see it, right
21  there. If you look right here, the top two floors, kind
22  of, stick out further than there. It's like an angled
23  porch that I talked about before. I was standing right on
24  that little, like, slab. It was probably a foot high
25  maybe. I don't remember exactly, but it's not high from

Page 21

1    the ground.
2        Q    Okay.
3        A    If it was even -- it might have even been
4    sidewalk level. I'm not positive on that, but I was
5    standing in that little crevice there, underneath that
6    corner, looking south.
7        Q    All right.
8        A    I didn't jump out into view of anybody. I
9    stayed to the corner. Because when I walked up onto the
10   corner here, I, kind of, cut across that. And, uh, I
11   could notice there was a scuffle going on. And I, kind
12   of, backed up a little bit and stayed out of view.
13       Q    Wayne, would you be willing to testify at a
14   trial to what you have just told us here today?
15       A    Yes. I have no reason not to.
16       Q    All right, sir.
17           MS. WILLIAMS: Ask about any person --
18   BY MR. MINCEY:
19       Q    And just, again, are you sure you didn't see
20   anybody else out on the street that night?
21       A    I saw nobody. Do you want me to tell you, why
22   exactly, I came to you?
23       Q    That would be great.
24       A    You keep asking me about did I see another
25   person. And, no, I did not. But reading that site, there

Page 22

1    was a person in question that was in court that admitted
2    to, uh, being, like, right there.
3        Q    Uh-huh.
4        A    Uh, if my memory serves me correctly, she was on
5    this side of the road, then went to this side of the road,
6    then went back to this side of the road, and then spent
7    her good old time walking across this way.
8        Q    Do you remember any of that?
9        A    No. She was not there. I did not -- I mean, as
10   long as her court testimony says that it took her to cross
11   17th Street --
12       Q    Uh-huh.
13       A    -- I would've had to have seen her.
14       Q    Okay.
15       A    I didn't look constantly. But I looked enough
16   to know that she was not there.
17       Q    Okay, fair enough. I think, that will just
18   about do it. Uh, yes, that's all.
19           MS. WILLIAMS: Did you ask him if he is giving
20   his statement willingly, of his own free will?
21           MR. MINCEY: We kind of alluded to it, but we
22   can ask it again.
23           MS. WILLIAMS: Okay.
24   BY MR. MINCEY.
25       Q    Wayne, again, you are here talking to us on your

Page 23

1    own free will?
2        A    Yes.
3        Q    And, for the record, you contacted LaTasha
4    first; is that right?
5        A    Well, I contacted the web site. I believe, you
6    left me an e-mail before.
7        Q    Right. But after we got your e-mail from the
8    web site?
9        A    Right.
10       Q    Okay.
11       A    And I didn't ask for money or anything like
12   that. I mean, I just felt the need to tell the truth. I
13   really thought that the right thing happened in this case,
14   and it didn't.
15       Q    All right.
16           MR. MINCEY: Thanks, Wayne, I appreciate your
17   time.
18           FURTHER, DEPONENT SAITH NOT
19
20
21
22
23
24
25

Page 24

1                CERTIFICATE
2    STATE OF TENNESSEE      )
3    COUNTY OF GRAINGER      )
4
5        I, NELLA ROBIN VARGAS, Court Reporter and Notary
6    Public at large, in and for the State of Tennessee,
7        DO HEREBY CERTIFY the foregoing testimony, was
8    taken at the time and place set forth in the caption
9    thereof; the witness therein was duly sworn an oath to
10   testify the truth; the proceedings were stenographically
11   reported by me in shorthand; and the foregoing pages,
12   numbered 1 through 24, constitute a true and correct
13   transcript of said proceedings to the best of my ability.
14       I FURTHER CERTIFY I am not a relative or
15   employee of any of the parties hereto; nor a relative or
16   employee of any attorney or counsel; nor do I have any
17   interest in the outcome or events of this action.
18       IN WITNESS WHEREOF, I have hereunto fixed my
19   official seal this 16th day of March, 2006.
20
21
22
23          _____
             Nella Robin Vargas, A.S.
             Notary Public at Large
24          State of Tennessee
             My commission Expires: 05/05/07
25

EXHIBIT

C

TRANSCRIPTS FROM STATE EVIDENTIARY HEARING

PAGES 83-84, 103, 113-114, 118-120

DATED: NOVEMBER 7, 2012

# First Judicial District of Pennsylvania

*51CR09332021991, 51CR09332031991*
*Carlton Bennett And Giovanni Reed*

---

*Hearing Volume 1*
*November 07, 2012*



*First Judicial District of Pennsylvania*
*100 South Broad Street, Second Floor*
*Philadelphia, PA 19110*
*(215) 683-8000   FAX:(215) 683-8005*

---

*Original File bennett.txt.txt, 133 Pages*
*CRS Catalog ID: 12121098*

Page 81

[1] Commonwealth vs. Bennett, et al
[2] Bennett, and Dwayne Bennett approach.
[3] He did not see Giovanni Reed and Carlton
[4] Bennett sit down next to him on either
[5] side. He did not see them grab his
[6] arms, force him to stand up. He did not
[7] see all three of them force Mr. Janke
[8] down the street. He did not see him
[9] walk down the street frightened with a
[10] gun at his head, stop in front of an
[11] iron gate just short of Kater Street.
[12] He did not see the robbery. Lorraine
[13] Hill did not see the robbery either.
[14] The other guys testified about taking
[15] the money, but it wasn't until after
[16] this series of events happened where all
[17] three participated in moving and robbing
[18] Robert Janke that then Wayne Richman
[19] comes on the scene allegedly and sees
[20] the final shot, sees him pull the
[21] trigger.
[22] It is clear that Giovanni Reed
[23] and Carlton Bennett were active
[24] participants in the felony gunpoint
[25] robbery of Robert Janke given the

Page 82

[1] Commonwealth vs. Bennett, et al
[2] testimony at trial, not just of Lorraine
[3] Hill, Tyrone Mackey and Richard King and
[4] even in all the statements of all the
[5] guys that night, who were out that
[6] night.
[7] The law is well established
[8] that if a homicide occurs in the
[9] furtherance of a robbery, all who
[10] participated including those physically
[11] absent -- these guys weren't absent.
[12] They were there. Even if they want to
[13] place themselves a little further away
[14] after the robbery. They are all equally
[15] responsible where the homicide was
[16] committed by the criminal Defendant or
[17] an accomplice acting in furtherance of
[18] the felony.
[19] To withdraw from a conspiracy
[20] to rob that results in a homicide, a
[21] criminal Defendant must abandon the
[22] scheme appreciably before the homicide
[23] occurs and must communicate his
[24] intention to his coconspirator, so that
[25] he also has the opportunity to abandon

Page 83

[1] Commonwealth vs. Bennett, et al
[2] the scheme.
[3] I have case law. Commonwealth
[4] versus Sampson, 285 A.2d 480 and this is
[5] a 1971, Commonwealth versus Ruffin, 463
[6] A.2d 1117, Pa. Super. 1983 and,
[7] furthermore, a criminal Defendant must
[8] take some affirmative act that wholly --
[9] this is a quote -- wholly deprives the
[10] commission of the offense of
[11] effectiveness or gives timely warning to
[12] law enforcement authorities or,
[13] otherwise, makes proper effort to
[14] prevent the commission of the offense.
[15] This is statutorily encompassed in 18 PA
[16] C.S. Section 306 (f)(3) (I)-(II) and 18
[17] PA C.S. Section 903 (g)(3). There is
[18] absolutely no evidence here to
[19] demonstrate that either Giovanni Reed or
[20] Carlton Bennett took any one of the
[21] affirmative acts enumerated here.
[22] Assuming arguendo that running
[23] away after the robbery was sufficient to
[24] amount to withdraw from the conspiracy,
[25] the Defendant did not do this until

Page 84

[1] Commonwealth vs. Bennett, et al
[2] after the robbery had completed. This
[3] kind of withdraw, after the completion
[4] of the felony, does not absolve the
[5] Defendant of criminal responsibility
[6] under the felony murder doctrine and
[7] they are guilty of second degree murder,
[8] regardless. The Defendants are entitled
[9] to no relief on the basis of Wayne
[10] Richman's testimony.
[11] THE COURT: Thank you,
[12] Counsel.
[13] Let's take a brief recess
[14] before we continue, Miss Williamson.
[15] MS. WILLIAMSON: Yes, Your
[16] Honor.
[17] - - -
[18] (Whereupon, a brief recess was
[19] taken from the proceedings.)
[20] - - -
[21] (Whereupon, all concerned
[22] parties returned, and the proceedings
[23] continued, at this time.)
[24] - - -
[25] THE COURT: Go ahead, counsel.

[1]     Commonwealth vs. Bennett, et al
[2] Bennett didn't shoot the kid? Of
[3] course, that is what was said, Your
[4] Honor, and that is exactly what Dwayne
[5] Bennett told the police when he went
[6] down there that day.
[7]     When Dwayne Bennett testified
[8] about his statement to police, again,
[9] totally incredible. He says that the
[10] police come in. They give him a
[11] statement of Carlton Bennett. He has it
[12] for about ten minutes he says. He says
[13] he, quotes, skimmed over it. I am not
[14] sure what that means. He doesn't really
[15] say what facts, if any, he gleaned from
[16] his, quote, skimming over it but,
[17] nonetheless, he says that he then
[18] proceeds to give a statement and he says
[19] that, as we went through it question by
[20] question, some of it he said was true;
[21] some of it he said he made up; some of
[22] it the detective made up.
[23]     I don't know how Detective
[24] Cahill could have even kept it straight
[25] what he was supposed to type on paper

[1]     Commonwealth vs. Bennett, et al
[2] because according to Carlton Bennett,
[3] some of it was coming from Carlton
[4] Bennett -- rather Dwayne Bennett. Some
[5] of it was coming from Dwayne Bennett's
[6] mouth, some of it evidently was coming
[7] from the detective's own head. He was
[8] just making it up as they went along.
[9] Again, it doesn't make any sense. It
[10] doesn't have the ring of truth and, in
[11] fact, if Dwayne Bennett was going down
[12] to the police station to tell the police
[13] that he was the person that committed
[14] the murder, why would he care that
[15] Carlton Bennett admitted to police
[16] implicating him? He was going to
[17] implicate himself, in fact. That is
[18] just what he did. He gave a statement
[19] to police implicating himself, saying I
[20] was the one who did the shooting.
[21]     If, in fact, he was really
[22] trying to, quote, get even with Carlton
[23] Bennett, as he told Your Honor during
[24] the hearing, then why not make Carlton
[25] Bennett the shooter? He could have done

[1]     Commonwealth vs. Bennett, et al
[2] that. He didn't do it because that is
[3] not the way it happened. He told the
[4] police what really happened that night,
[5] which was that they all went out looking
[6] to rob people. They came upon Robert
[7] Janke, planned to rob him. All three of
[8] them were down for a robbery. All three
[9] of them participated in the robbery.
[10] All three of them walked Mr. Janke up
[11] the street but Dwayne Bennett blew it at
[12] the end when he fired a shot. Nobody
[13] anticipated that he was going to do
[14] that, certainly not Giovanni Reed and
[15] Carlton Bennett. Nobody was down for
[16] that but they were down for a robbery
[17] and that is what he told the police and
[18] that is what makes sense in this case,
[19] Your Honor.
[20]     He claims that he put Giovanni
[21] Reed in the statement simply because
[22] Giovanni Reed and Carlton Bennett were
[23] best friends. He says they were, quote,
[24] best friends. Well, we know that is not
[25] true, number one. First of all, it

[1]     Commonwealth vs. Bennett, et al
[2] makes no sense. It is just ridiculous.
[3] It is just out of thin air, he is going
[4] to pluck Giovanni Reed from all the
[5] other boys that they were with that
[6] night and decide Giovanni Reed is the
[7] one I will put in here with Carlton
[8] Bennett as participating in the
[9] robbery/murder with me. I will not say
[10] it was Tyrone Mackey, or Richard King,
[11] or DaJuan Bennett. I am going to just
[12] pick Giovanni Reed because he is, quote,
[13] best friends with Carlton Bennett.
[14] Well, that is not true because both
[15] Giovanni Reed and Carlton Bennett told
[16] you that they are not best friends,
[17] that, in fact, Giovanni Reed is closest
[18] with Carlton Bennett's younger brother
[19] and that Carlton Bennett and Giovanni
[20] Reed were friends merely through the
[21] brother but certainly not best friends
[22] as Dwayne Bennett would have you
[23] believe.
[24]     I thought it was really
[25] interesting too that Dwayne Bennett

Page 113

[1]    Commonwealth vs. Bennett, et al
[2] around. That is what he couldn't get
[3] his head around then. That is what he
[4] can't get his head around now.
[5]    THE COURT: I think he doesn't
[6] understand what felony murder is maybe.
[7]    MS. WILLIAMSON: That too.
[8]    THE COURT: Which is a big
[9] problem in this case.
[10]    MS. WILLIAMSON: The bottom
[11] line in this case, Your Honor, is that
[12] by Dwayne Bennett doing what he did, and
[13] I think it is probably true that Carlton
[14] Bennett and Giovanni Reed had no reason
[15] to suspect that Dwayne Bennett was going
[16] to kill Robert Janke -- I do think that
[17] is probably true, Your Honor. I can't
[18] get inside their head but it is
[19] reasonable to assume they did not know
[20] that but for Dwayne Bennett's actions
[21] these young men would have done a
[22] 5-to-10-year sentence and they would be
[23] on the street right now living their
[24] lives and it is only because of Dwayne
[25] Bennett's actions that all three of them

Page 114

[1]    Commonwealth vs. Bennett, et al
[2] are now serving life sentences. That is
[3] what Dwayne Bennett wanted to explain;
[4] that's what Dwayne Bennett wanted to
[5] clarify; that's what Dwayne Bennett
[6] wanted to tell the police when he went
[7] down to give his statement at 8th and
[8] Race a week after the incident was that
[9] it wasn't supposed to go down this way.
[10] He wasn't supposed to get shot, that's
[11] not what any of us intended.
[12]    Then you have this bizarre
[13] affidavit that Dwayne Bennett crafts in
[14] 1993 which for some bizarre reason, he
[15] only provides to Giovanni Reed. It is
[16] totally inexplicable which allegedly
[17] Giovanni Reed never gives to Carlton
[18] Bennett. Again, totally inexplicable.
[19] It doesn't make any sense. It is either
[20] a lie and he did provide it to Carlton
[21] Bennett and Carlton Bennett doesn't want
[22] the Court to know because it would then
[23] make his current claim obviously
[24] untimely or it is true and then it makes
[25] you wonder, well, if Giovanni Reed put

Page 115

[1]    Commonwealth vs. Bennett, et al
[2] so little value in this affidavit
[3] written by Dwayne Bennett that he never
[4] raised a claim regarding it; he never
[5] brought it to anyone's attention; he
[6] never took it into court and he never
[7] even gave it to his codefendant, then
[8] what is it really worth?
[9]    It is worth nothing because
[10] both Carlton Bennett and Giovanni Reed
[11] know what happened. They were out there
[12] that night. They know that they were
[13] all down for this robbery and that
[14] Dwayne Bennett changed the game when he
[15] shot Robert Janke.
[16]    The 1993 affidavit is
[17] interesting in that in the affidavit,
[18] Dwayne Bennett says I turned myself in,
[19] in part -- quote, I turned myself in on
[20] August 17, 1991 and was pressured by the
[21] police to make a statement which
[22] implicated Giovanni Reed. The
[23] statement, which was made on August 17,
[24] 1991, is untrue although he misspelled
[25] that and he spells it U-N-T-U-R-E and

Page 116

[1]    Commonwealth vs. Bennett, et al
[2] the only reason why I implicated
[3] Giovanni is because I was pressured into
[4] it by the police. Again, that is really
[5] interesting because that is what he is
[6] saying in 1993. I did it because the
[7] police made me do it. That is not what
[8] he told Your Honor. He said I put
[9] Giovanni Reed in the case simply because
[10] he and Carlton Bennett were, quote, best
[11] friends. They weren't best friends but,
[12] nonetheless, he tells you that is the
[13] reason, a reason which makes no sense
[14] whatsoever. There was no pressure from
[15] the police.
[16]    What he said in 1993 in the
[17] affidavit was a lie. What he said
[18] before this Court was a lie. What he
[19] said to the police in his statement is
[20] the truth and then you have the 2008
[21] affidavit of Dwayne Bennett and, again,
[22] Your Honor, more lies because in the
[23] 2008 affidavit of Dwayne Bennett, he
[24] says in paragraph six and paragraph
[25] seven of the affidavit, quote, paragraph

Page 117

[1]      Commonwealth vs. Bennett, et al
[2]   six, prior to my guilty plea, I tried to
[3]   explain to the Trial Prosecutor that I
[4]   did not mean to shoot Mr. Janke, that it
[5]   was an accident and that both Carlton
[6]   and Giovanni were not involved but were,
[7]   in fact, further down the street at the
[8]   time of the incident. Then he goes on
[9]   in paragraph seven and further states,
[10]   quote, the Trial Prosecutor told me that
[11]   in order to save myself from a death
[12]   sentence, I had to plead guilty and name
[13]   Carlton and Giovanni as coconspirators.
[14]      So that is what he says in the
[15]   affidavit and, by the way, he says I
[16]   didn't type the affidavit but I provided
[17]   the information that was in it. I told
[18]   the guy in the law library what I wanted
[19]   it to say. He wrote it up. He reviewed
[20]   it with me and I signed it as being
[21]   accurate but then somehow he comes in
[22]   here and says, oh, no, Mr. McGovern
[23]   never spoke to the guy, never said a
[24]   word to him. So, again, Your Honor, you
[25]   have these affidavits that are just

Page 118

[1]      Commonwealth vs. Bennett, et al
[2]   completely inconsistent with his
[3]   testimony before this Court;
[4]   inconsistent with one another;
[5]   inconsistent with any semblance of
[6]   rationality and I would submit to the
[7]   Court, complete and utter lies.
[8]      What was truthful, Your Honor,
[9]   is what Dwayne Bennett told Miss Graham
[10]   Rubin and Detective Rocks when he came
[11]   to our office shortly before the hearing
[12]   and was interviewed briefly and you know
[13]   from Detective Rocks that what he
[14]   said -- by the way, with respect to the
[15]   testimony of Detective Rocks before this
[16]   Court, I think Mr. Wiseman indicated in
[17]   his argument that Detective Rocks was
[18]   lying to the Court.
[19]      I would submit to the Court
[20]   that that makes no sense and that what
[21]   you had was to the extent Detective
[22]   Rocks stated that there was no
[23]   discussions about affidavits. There was
[24]   no discussions about prison programs.
[25]   There was no discussions about Carlton

Page 119

[1]      Commonwealth vs. Bennett, et al
[2]   Bennett's relationship or family members
[3]   or any of these things, none of that
[4]   mattered to Detective Rocks. He is a
[5]   homicide detective, not a social worker.
[6]   He is a homicide detective, not a PCRA
[7]   DA. He doesn't care two licks about
[8]   affidavits, social workers at the
[9]   prison, who is related to who. He cares
[10]   about one thing and one thing only, it
[11]   is his bread and butter. It is what he
[12]   has been doing for 27 years. So when
[13]   they are talking about the crime and the
[14]   facts of the case, he is paying
[15]   attention and he is listening and when
[16]   he came in before this Court and he
[17]   testified, and it was obvious he wasn't
[18]   prepped and he said I didn't review
[19]   anything before today's testimony. I
[20]   didn't talk to the DA. I didn't talk to
[21]   Miss Graham Rubin. I didn't talk to the
[22]   other detective that was in the room
[23]   with us. What I'm telling you here
[24]   today is based on my recollection. I
[25]   didn't take notes. I didn't write it

Page 120

[1]      Commonwealth vs. Bennett, et al
[2]   down. Miss Graham Rubin was taking
[3]   notes he said and what I recall is that
[4]   Dwayne Bennett told me the following:
[5]   All three of us robbed Robert Janke.
[6]   All three of us had guns. Dwayne
[7]   Bennett put the gun to his head while
[8]   the other two were going through his
[9]   pockets. We all knew about the robbery.
[10]   What we all didn't know was that I was
[11]   going to shoot and kill Robert Janke
[12]   when it was over and that, Your Honor,
[13]   is the truth. That's what happened in
[14]   this case and it is a tragedy. It is a
[15]   tragedy for everyone involved but that's
[16]   what happened in this case and that,
[17]   Your Honor, is second degree murder,
[18]   plain and simple. It is what they were
[19]   convicted of. It's what it is. It
[20]   can't be undone. It can't be undone.
[21]   It's just it is what it is and I would
[22]   submit to the Court that to the extent
[23]   that Dwayne Bennett came in here and
[24]   tried to tell you some other version of
[25]   events, it was wholly incredible. It is



PA DEPARTMENT OF CORRECTION
INMATE MAIL

Name: GIOVANNI REID

Number: CA-0466

Box 244

Graterford, PA 19426-0244

LEGAL MAIL

U.S.M.S. X-RAY

Mr. Michael E. Kunz, Clerk
United States District Court
For The Eastern District
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

PRIORITY MAIL

INSURED

UNITED STATES POSTAL SERVICE

For Domestic Use Only

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL

Two (2) Envelopes, 4 Copies of each Document

Giovanni Reid, CA0466
P.O. Box 244
Graterford, PA 19426-0244

Mr. Michael E. Kunz, Cle
U.S. District Cour
601 Market Street, Rm. 2
Phila, PA 19106-1797